# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

LAURA HAWKINS,

               Plaintiff,

    vs.

BOARD OF COUNTY COMMISSIONERS
OF COFFEY COUNTY KANSAS;
CHRISTOPHER PHELAN; KAREN
MALEY; and BRENDA CHERRY,

               Defendants.

Case No.  17-CV-2687-KHV-KGS

## MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT

COMES NOW the Plaintiff, pursuant to Fed.R.Civ. Pro. 15(A), and D. Kan. Rule 15.1 and moves the court for an order allowing her to amend her Complaint to add a party and allegations about incidents that occurred after the lawsuit was filed. A copy of the proposed Second Amended Complaint is attached hereto and a memorandum in support is filed herewith.

Respectfully submitted,


/s/ Gaye B. Tibbets
Gaye B. Tibbets, 13240
HITE, FANNING & HONEYMAN L.L.P.
100 N. Broadway, Ste. 950
Wichita, KS 67202-2209
Telephone: (316) 265-7741
Facsimile: (316) 267-7803
E-mail: tibbets@hitefanning.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of July, 2019, I electronically filed the foregoing *Motion for Leave to File a Second Amended Complaint* with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.


/s/ Gaye B. Tibbets
Gaye B. Tibbets

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LAURA HAWKINS,

               Plaintiff,

     vs.

BOARD OF COUNTY COMMISSIONERS
OF COFFEY COUNTY KANSAS;
CHRISTOPHER PHELAN;
KAREN MALEY; BRENDA CHERRY; and
HEIDI HARRIS,

               Defendants.

Case No.  17-CV-2687-KHV-KGS

## SECOND AMENDED COMPLAINT

### Parties

1.      Plaintiff is a resident of the state of Kansas.

2.      Defendant Board of County Commissioners, Coffey County Kansas is a municipality located in Kansas.

3.      Board of County Commissioners of Coffey County can be served by serving the county clerk. Angie Kirchner is the County Clerk of Coffey County and her address is 110 S. 6th St., Room 202, Burlington, Kansas 66839.

4.      Defendant Christopher Phelan is the county attorney of Coffey County, Kansas. His business address is Coffey County Courthouse, 110 S. 6th St., Room 204, Burlington, Kansas 66839. He can be served at his home address at 517 Jason St., Burlington, KS 66839.

5.    Defendant Karen Maley is the Coffey County Treasurer. Her business address is Coffey County Courthouse, 110 S. 6th St., Room 204, Burlington, Kansas 66839. She can be served at her home address of 11 Rock Ridge Road, Burlington, Kansas 66839.

6.    Defendant Heidi Harris is the County Zoninig and Subdivision Administrator. She can be personally served at the County Engineer's office, 1510 S. 6th Street, Burlington, Kansas.

7.    Defendant Brenda Cherry was the Coffey County Treasurer during 2012-2017.  Her address is 702 Sanders St., Burlington, Kansas 66839.  She retired in January 2017 and Karen Maley took office as Coffey County Treasurer February 1, 2017.

**Plaintiff's tenure at the Coffey County Clerk's office.**

8.    Plaintiff was employed for over 9 years as a Clerk in the Treasurer's office at Coffey County. She was hired as a Clerk and, though she received raises, she was never promoted. Her duties always remained the same.

9.    Plaintiff belonged to the class of employees of Coffey County who worked in departments headed by elected officials.

10.    Plaintiff never asked to be assigned to a department headed by an elected official. When she was hired by the county, she was not told that she would be treated differently than other county employees because she worked for an elected official. The handbook she was issued does not say that some policies apply only to those who do not work for elected officials.

11.    During her tenure as a County employee, Plaintiff complained to Defendant Phelan, the County Attorney, about various personnel actions by her supervisors and her view that the actions violated either anti-discrimination laws or county personnel policies. Phelan told her that he could not help her because elected officials could do whatever they wanted and there was nothing he could do. Phelan told her this would not be true if she worked in a department that was

2

headed by an appointed official, but that the rules were different for employees who worked for elected officials.

**Defendant Cherry's and the County's violations of FLSA and KWPA.**

12.     While Defendant Cherry was Plaintiff's supervisor, she was Plaintiff's "employer" as that term is used in the Fair Labor Standards Act. Also, the County was Plaintiff's "employer" as well.

13.     The County was also Plaintiff's "employer" as that term is used in the Kansas Wage Payment Act. Also, because Cherry was Plaintiff's manager who knowingly let her work without pay, she was an "employer" pursuant to K.S.A. 44-323(b).

14.     During 2014-2016, when Plaintiff reported on her timecard that she worked through lunch or she worked overtime, Defendant Cherry would "white out" time reported by Plaintiff to deprive Plaintiff of overtime pay. Also, during that time, Defendant Cherry forbade Plaintiff from recording time that she worked through all or part of her lunch hour, even though Cherry knew that Plaintiff was working during that time. Every day Plaintiff arrived at work 15-20 minutes before others and spent that time working. She was told by Defendant Cherry that she must work by waiting on anyone who came to the office before 8 a.m. because some people needed to take care of their business and get to work on time. Cherry knew Plaintiff was working during that time, had instructed her to do so, and did not pay her regular or overtime for that time.

15.     Defendant Cherry suffered or permitted Plaintiff to work more than 40 hours a week without paying her overtime pay.

16.     Defendant Cherry and the County willfully withheld wages from Plaintiff when she whited out time on Plaintiff's timecard or refused to let Plaintiff record time that she was working through her lunch hour or before her shift or did not pay her for her pre-shift work.

3

**Plaintiff's unsuccessful candidacy for political office.**

17.     In 2016, Plaintiff unsuccessfully ran in the Republican primary against Defendant Maley for the position of the Republican nominee for County Treasurer. She lost.

18.     In the general election, Plaintiff campaigned as a write-in candidate, but Defendant Maley was again the successful candidate.  Maley's term was to begin in October, 2017.

19.     Plaintiff's announcements for her candidacies in the general and primary elections were protected speech and matters of public concern.

20.     During the campaign and outside of the office, Plaintiff accused the current Treasurer's office of "playing favorites" and vowed to treat all citizens the same, no matter who they were. Plaintiff said that the current office held some citizens to the rules but let those they knew be treated more favorably. This was a matter of public concern.

21.     During the campaign and outside of the office, Plaintiff took issue with the County's practice of not encouraging elected officials to make personnel decisions "subject to" the County's policies and procedures. Among other places, she expressed this opinion at the candidate forum in the presence of Maley and Phelan. This was a matter of public concern.

22.     During the campaign and outside of the office, Plaintiff was critical of county employees for campaigning and writing a letter to the editor while using their county employee titles. She said that this violated the County policies and that employees were being paid while they were campaigning, which was a matter of public concern.

**Maley becomes County Treasurer and as her "first executive order" terminates her prior political opponent.**

23.      Defendant Cherry, the acting County Treasurer, resigned in early 2017 and Defendant Maley was sworn in as County Treasurer on February 1, 2017.

4

24.     On January 30, 2017, the Board of County Commissioners met in executive session to discuss Plaintiff's termination. The Board of County Commissioners and County Attorney knew that Plaintiff had unsuccessfully challenged Maley in the election for Maley's post and had made statements critical of the way the office had been run.

25.     The Board of Commissioners and the County Attorney assisted Maley in terminating her political opponent.

26.     On February 1, 2017, the first day of Maley's term, Maley fired Plaintiff, her former political opponent, telling her that her termination was Maley's "first executive order." Prior to meeting with Plaintiff, Maley had procured Plaintiff's final paycheck and had drafted a termination letter that said:

> Effective immediately, you are hereby dismissed from your job duties in the Coffey County Treasurer's office. Pursuant to KSA 19-503(a), I am exercising my right to appoint, promote, demote and dismiss all assistants. You are hereby allowed 15 minutes to gather your personal belongings and return any and all keys to the office and/or building. Enclosed is your final check.

27.     Though K.S.A. 19-503(a) allows a County Treasurer to appoint, promote, demote and dismiss all assistants, the statute also provides **that this must be done "subject to the personnel policies and procedures established by the county."**

**County Personnel Policies and Procedures.**

28.     The County's personnel policies and procedures are contained in part in the Policy and Procedures Manual ("PPM"). Plaintiff was provided a PPM during her employment with the County and she accepted and continued her employment with the County based in part on the promises contained in the PPM and on the personnel customs of the County.

5

29.     The PPM says that "The County shall not abridge the rights of Employees to engage in political activity, including the holding or public office, except as specifically included in this [manual.]…Employees are neither appointed to, nor retained in, county service based upon their political affiliation or activity, with the exception of Officials who serve at the pleasure of their constituency."

30.     The PPM also says that its intent is to "ensure that…retention and separation from service of employees is based upon employee's qualifications and fitness and is in compliance with Federal and Kansas laws." The manual says that it applies to all employees.

31.     The PPM also provides that "The tenure of County employees shall be based on reasonable standards of job performance and personal and professional conduct."

32.     The PPM also provides that "Terminations not for cause are discouraged."

33.     Employees who wish to resign may do so but must give two weeks' notice or they will not be considered for rehire and will not be paid their sick leave and vacation.

34.     The PPM does not allow unfettered rights to terminate. It says that "terminations by Supervisors [are] subject to the Standards of Conduct and Discipline and Grievance Procedures."

35.     The Standards of Conduct are "standards for high quality work performance and conduct." They are outlined in the PPM as performance expectations which can result in employee discipline, including discharge, if they are not met.

36.     The PPM for Defendant Coffey County provides for a mandatory pre-disciplinary hearing when an employee is discharged or suspended without pay or demoted for poor performance or for violations of Standards of Conduct. An employee who is being discharged for disciplinary reasons is entitled to notice and a hearing and the representation by counsel. She is

also entitled to written notice of the reasons for discharge, along with "an explanation of the…evidence." The County requires that the employee be allowed to present, either orally or in writing, why the employee should not be suspended or discharged. None of these procedures were used for Plaintiff's discharge.

37.     The PPM for Defendant Coffey County also provides grievance procedure "to be utilized specifically for claims or dispute by an employee with respect to the interpretation, meaning or application of the provisions of county departmental policies and procedure and does not included ADA, disciplinary action, sexual harassment or staffing and salary disputes…" The PPM says that "terminations by Supervisors [are] subject to the Standards of Conduct and the Grievance Procedures." The Grievance procedure is not available for disciplinary terminations because those have their own pre-termination procedures, as discussed in the previous paragraph.

38.     The PPM also has an appendix that is entitled "time period for actions" and provides that a pre-termination hearing is required for terminations.

**Plaintiff attempts to exercise her right to file a Grievance.**

39.     The PPM provides that Plaintiff was entitled to a Grievance. Had Plaintiff been allowed to file a Grievance she would have challenged Maley's right to terminate her under the statute and she would have challenged Maley's failure to follow county policies in her termination.

40.      A Grievance begins with a complaint to either one's supervisor or, if the supervisor is the one about whom the grievance is to be filed, to the County Attorney "for advice and counsel on how to enter the Grievance Procedure."

41.     Plaintiff sent Defendant Phelan, the County Attorney, two emails in the days after her termination telling him that she needed his assistance and asking him to contact her. She also called Defendant Phelan twice and spoke with his assistant. She told the assistant she needed to

speak to Phelan and he had not responded to her emails. She was following the handbook's instructions to ask for advice and counsel about requesting a due process hearing about her termination.

42.     When she was unable to get Defendant Phelan to respond to her calls and emails, she reached out to him a third time by email early in the evening of February 13, saying:

> When I received my termination letter from Karen Maley on February 1, no one said anything about how I could file a grievance about it.  According to 11.2 of the Policy Manual, it says I should contact the county attorney for advice on how to enter the grievance procedure.   Can you tell me what I need to do?

43.     Defendant Phelan did not respond to that email, so she called his office at about 2:30 in the afternoon February 14 and spoke to his secretary.  She asked to speak with Defendant Phelan. The secretary said he had not been in all day because he was in court. The secretary asked if there was a message or if she could help. Plaintiff told her that she had sent Phelan an e-mail the night before and had not heard back from him, so she wanted to talk to him. The secretary said that when Phelan came in she would let him know that Plaintiff had sent him an e-mail.

44.     The following day, February 15, Plaintiff called Phelan's office twice. The first time was about 10:15 a.m. and she was told by the secretary that she had asked Phelan about the email and he said he had not received an email from Plaintiff. Plaintiff said she would re-send the email and asked that Phelan call her. The secretary said he would not be available to call her that day.

45.     About 15 minutes later, Plaintiff called the secretary again to say that she had re-sent the email. She asked that Phelan search his junk emails if he did not receive it. She told the

secretary that she had a very brief question for Defendant Phelan and that it was important that he call her. The secretary said he was unavailable all day, but she would deliver the message.

46.     The afternoon of February 15, Defendant Phelan responded to the email she had sent at 10:30 a.m. on February 15. He refused to assist her, saying he represented the County and giving her advice would be a conflict and that she should contact a private attorney.

47.     At this point, Plaintiff had exhausted the PPM's instructions about how to invoke the Grievance procedure and had still not been given the opportunity for a hearing.

48.     Because of her termination and her inability to challenge her termination, Plaintiff has lost wages and has not been able to find a job with comparable salary and benefits. She has suffered mental distress because of Defendants' actions.

**Plaintiff exercises her right to file a lawsuit and make allegations against the County**

49.     Plaintiff filed suit against all Defendants except Harris on December 5, 2017.

50.     After two unsuccessful Motions to Dismiss, the court ruled that the case would go forward on March 19, 2019.

51.     Discovery in the case began in early summer 2019.

**Plaintiff and her husband's business in Coffey County**

52.     Plaintiff and her husband raise domesticated deer at their home and on some acreage located on Quail Lane in Burlington, Kansas.

53.     Plaintiff spoke with Heidi Harris and Wayne Blackbourn a number of times in 2015 and 2016 prior to building their fences about whether their operation on Quail Lane had any zoning restrictions. They were assured they did not.

54.     Without Plaintiff's knowledge or notice to her or input from her or her husband, Harris allegedly began "an investigation" and "made findings" about the Quail Lane property on May 2, 2019. Those findings were never disclosed to Plaintiff or her husband.

55.     On July 2, 2019, Harris sent Plaintiff and her husband a letter, attached as Exhibit A, that suggested they set up a hearing to determine "whether they were in violation" of unspecified zoning ordinances. This was the first Plaintiff had heard of Harris's investigation or any concerns from the zoning department. The letter was copied to the Commissioners, the County Attorney and Environmental Health.

56.     Plaintiff and husband contacted Harris and asked what ordinances they were violating, but Harris would not tell her. Plaintiff and her husband told Harris that they were raising domesticated deer and so their property was considered a farm.

57.     Plaintiff and her husband asked Harris what prompted the investigation and Harris said that she "was driving around and noticed a fence and 'decided to investigate.'"

58.     Plaintiff asked Wayne Blackbourn, the County Engineer, on the phone why the County was taking an interest in 2019 in the zoning their property, when their property had remained unchanged since 2016. He said the County had "received a formal complaint." When she asked who had complained, he refused to tell her.

59.     There is another business in Coffey County that is very similar to Plaintiff's. It has not been investigated and there have been no findings that it is violating any zoning ordinances. The owners of that business have not filed suit against the County or made statements critical of the County.

60.      On July 25, 2019, Harris sent a letter telling Plaintiff that they were in violation of zoning ordinances because her investigation found that they were operating a "hunting preserve."

10

She said that this finding, which had never been provided to Plaintiff or her husband, had to be appealed within 30 days.

61.     The letter was copied to the Commission and the County Attorney and Environmental Health.

62.     Plaintiff called Marilyn Eccles, Environmental Health, to ask why that department was copied on the July 2 letter. The response was that "a complaint must have been filed" about their waste lagoon. The lagoon had been in the same condition since 2016 and Plaintiff had never received any notification from Environmental Health that there was a problem with it.

### Count 1:  42 USC §1983--Violation of First Amendment Rights in Her Termination Against Maley, the County and Phelan.

63.     Plaintiff was fired by Defendant Maley because of statements she made when she unsuccessfully challenged Maley in the previous year's elections. Discharging an employee for statements made during her her political activity violates the employee's First Amendment rights to free speech.

64.     The County and Phelan assisted Maley in the termination by helping her draft the termination letter and providing an early final paycheck. The County did this even though it knew that Maley was firing Plaintiff for political reasons. Policy-makers at the County, including Defendant Phelan and the commissioners, also ratified Maley's decision to discharge Plaintiff though they knew or should have known it violated Plaintiff's constitutional rights.

65.     The decision to fire Plaintiff was made by those with final policymaking authority and was ratified by those with final policymaking authority.

66.     Firing a political opponent as a "first act" demonstrates a lack of training on the part of the County about protection of First Amendment rights in making personnel decisions.

11

67.     Defendant Phelan assisted Maley in terminating Plaintiff in violation of her First Amendment rights by assisting Maley in the unconstitutional termination, drafting the termination letter, and by ratifying the action after learning about it.

WHEREFORE, Plaintiff prays for judgment and damages in excess of $75,000 against the County and Maley and Phelan, and for attorney's fees and reinstatement or front pay in lieu of reinstatement and all backpay and loss of benefits and all other relief legal and equitable to which she is entitled.

### Count 2:   42 USC §1983—Violation of Rights to Due Process Under Fifth and Fourteenth Amendments against the County and Phelan and Maley.

68.     The handbook and county practice created an implied contract with Plaintiff that she would not be terminated for performance without a pre-termination hearing and that she would not be terminated except for cause. The handbook also created an implied contract with Plaintiff that she would not be terminated for her political activity.

69.     Though the statute cited by Defendant Maley in her letter allows her to hire assistants and deputies, her power to do so is limited later in the statute, which requires her actions be "subject to the personnel policies and procedures established by the county." That would include the provisions of the handbook. None of the Defendants complied with the provisions of the handbook. The statute entitles Plaintiff to the right to have her discharge be done in compliance with the County's personnel policies and procedures. It was not.

70.     Plaintiff's First Amendment right to announce her run for office is a fundamental free speech right and discharging her for running for office is a substantial infringement on that right. Denying Plaintiff a way to challenge that unconstitutional action violated her due process rights.

12

71.     As a County employee, Plaintiff had a due process right to notice and an opportunity to be heard before and after her discharge. She was given neither, nor was she told at the time of her discharge the reasons for her discharge as is required by the policy.

72.     The County promises employees whose employment is terminated because of work performance a pre-termination hearing. Plaintiff was not given a pre-termination hearing.

73.     Plaintiff attempted to utilize the grievance procedure to get notice and a hearing for her termination. The PPM's procedure is that when her supervisor is the one against whom she wishes to file a grievance, she is to contact the county attorney for information about the process. She contacted him repeatedly, but he refused to assist her, leaving her with no avenue for due process.

74.      Because Plaintiff had a constitutional right not to be terminated for her announcement of her candidacy and she had contractual and statutory rights to have the County's personnel policies applied to her, she had a due process right to notice and opportunity to be heard either before or after her termination. This has been refused.

WHEREFORE, Plaintiff prays for judgment and damages in excess of $75,000 against the County and Maley and Phelan, and for attorney's fees and reinstatement or front pay in lieu of reinstatement and all backpay and loss of benefits and all other relief, legal and equitable, to which she is entitled.

### *Count 3:  For violation of the Fair Labor Standards Act against the County and Cherry.*

75.     Cherry willfully suffered and permitted Plaintiff to work more than 40 hours a week without paying her overtime. Cherry told Plaintiff to work pre-shift, knew Plaintiff worked pre-shift, knew Plaintiff worked through all or part of her lunch hour on occasion and instructed

Plaintiff not to record that time on her timecard. Cherry also changed Plaintiff's timecard on occasion so that Plaintiff would not be paid the overtime pay she was due.

76.     Cherry and the County's actions were willful and not accidental.

77.     Cherry was a policy-maker for the County and the County is responsible for her actions. Also, Cherry's instructing Plaintiff not to record her time was part of a custom and practice at the County. Also, Cherry's behavior demonstrates a lack of training at the County.

78.     Plaintiff frequently worked more than 40 hours a week because she worked at least 15 minutes every day pre-shift. She also worked for part or all of her lunch hours frequently and was not allowed to record that time or be paid for it.

WHEREFORE, Plaintiff prays for her overtime wages and for liquidated damages and for attorney's fees and for pre-and post-judgment and statutory interest and for an injunction ordering the County to comply with the FLSA and for all other such relief legal and equitable to which she is entitled.

### Count 4:   For Violation of the Kansas Wage Payment Act against Cherry and the County.

79.     By willfully withholding wages from Plaintiff for hours that they knew Plaintiff worked, Defendants Cherry and the County violated the Kansas Wage Payment Act.

80.     The County and Cherry knew that Plaintiff worked prior to 8 a.m., and sometimes through all or part of her lunch hour and that she was not paid for it. Cherry sometimes changed her timecard to prevent her from being paid for time she had been working.

WHEREFORE, Plaintiff prays for her unpaid wages plus the statutory penalty and interest, attorney's fees, pre and post judgment interest and attorney's fees and all other legal and equitable relief to which she is entitled.

*Count 5:  For Violation of 42 U.S.C 1983 for Retaliation against Plaintiff as a Non-Employee After She Filed Suit*

81.     Plaintiff ceased being an employee after Defendant Maley took office.

82.     Plaintiff and her husband's business is being cited for zoning violations, after she had been verbally assured for years by Harris and Blackbourn that there were not regulations that applied to their business.

83.     A different business in the county operates very similarly to Plaintiff and her husband's business and that business has not been cited for zoning violations, nor have the owners of that business been told to file a special use permit.

84.     Plaintiff had an inquiry from Environmental Health about a lagoon that had been standing without incident for years and was told a formal complaint "must have been filed."

85.     The County has been involved and known of these retaliatory actions.

86.     The actions of Defendant Harris and of the County and of any Defendant who filed a report against Plaintiff or encouraged a third party to file a report against Plaintiff were in retaliation for Plaintiff's suit against the county and for Plaintiff's criticism of Defendants.

87.     The retaliation by Harris and the County and potentially another Defendant violated Plaintiff's rights to free speech, her right to advocate for her First Amendment rights and her right to seek redress for her injury.

88.     As a result, Plaintiff has suffered mental distress and incurred attorney's fees and suffered other harm.

WHEREFORE, Plaintiff prays for her damages, including attorney's fees she would not have incurred but for the retaliation and any fines and compensation for her time fighting the

15

violations and attorney's fees, pre and post judgment interest and all other legal and equitable relief

to which she is entitled.

Respectfully submitted,

_____
Gaye B. Tibbets, 13240
HITE, FANNING & HONEYMAN L.L.P.
100 N. Broadway, Ste. 950
Wichita, KS 67202-2209
Telephone: (316) 265-7741
Facsimile: (316) 267-7803
E-mail: tibbets@hitefanning.com
*Attorneys for Plaintiff*



**COFFEY COUNTY PLANNING BOARD**

Heidi Harris
Zoning and Subdivision Administrator
Phone: 620-364-2441 or 866-937-2897
Fax: 620-364-8271

July 1, 2019

Danny Hawkins
1334 Shetland Rd
Burlington, KS 66839

SENT BY CERTIFIED MAIL

Dear Mr. Hawkins,

It has come to my attention you are operating a privately-owned hunting preserve for deer on your 80-acre tract on Quail Lane, Burlington, KS 66839.

Please call me at 620-364-2441 by July 11, 2019 to arrange for an Administrative Hearing, to determine the facts and whether or not a violation may have occurred. It would be helpful to bring with you any papers which substantiate facts and may provide an explanation for the situation which has or is occurring.

Your cooperation in resolving this matter will be appreciated.

Sincerely,

Heidi Harris

Heidi Harris
County Zoning and Subdivision Administrator

Cc File
Cc Commission
Cc County Attorney
Cc Environmental Health

# EXHIBIT A

County Engineer's Office • 1510 S.6th St. • Burlington, KS 66839 • Phone 620-364-2441 or 866-937-2897 • Fax: 620-364-8271

PAGE 02/03                    NEW STRAWN BRANCH                    6203645354    13:17    07/09/2019